LOUISVILLE & NASHVILLE RAILROAD CO. *v.* D. C. SATTER-
WHITE, *Administrator.*

## (*Nashville.*   December Term, 1903.)

1. **BILL OF EXCEPTIONS.** Necessary for review of action on
petition for removal to federal court.

In the absence of a wayside bill of exceptions, preserving and em-
bodying in the record the petition, bond, affidavits, etc., for the
removal of the cause from the State court to the federal court,
the action of the lower court upon the petition cannot be re-
viewed by the State supreme court upon appeal of the cause
after a trial on its merits, because there is nothing before such
court for review.  (*Post, pp.* 191-192.)

Case cited and approved:  Railroad v. Fort, 4 Cates, 432.

2. **RAILROADS.** Negligence to go upon track without looking
or listening; exceptions.

A railroad track is an admonition of danger, and to go upon it
without looking or listening is generally an act of negligence,
but this is not an inflexible rule, for there are many conditions
and environments that excuse the exercise of this legal duty.
(*Post, p.* 202.)

See citations under headnote 3.

3. **SAME.** Crossing tracks without looking or listening is not
negligence per se, when.

Crossing a railroad track without listening when it is seen there
is no danger, or when one is deaf, or the noise of the surround-
ings are so great as to preclude all possibility of hearing, or
crossing, without looking, when the view is absolutely cut off,
or so obstructed that nothing can be seen until entrance upon
the track, is not negligence *per se.*   (*Post, pp.* 201-204.)

Railroad v. Satterwhite.

Cases cited and approved:    Patton v. Railroad, 89 Tenn., 371; Railroad v. Dies, 98 Tenn., 663; Wilson v. Railroad, 105 Tenn., 74; Railroad v. Ives, 144 U. S., 408.

**4. SAME. Same. Case in judgment.**

Whether a person driving across a railroad track is negligent in failing to look and listen, where the loud noise of a mill probably drowned the noise of the approaching train, and a string of cars parked on the side track obstructed the view of it, is a question for the jury; for the failure to look and listen under such circumstances does not constitute negligence *per se*, or as a matter of law.   (*Post, pp.* 200-204.)

See citations under headnote 3.

**5. SAME. Inability to hear or see an approaching train requires great care in crossing railroad tracks.**

Where one about to cross a railroad track cannot hear an approaching train on account of the noise of a mill, nor see it on account of obstructions, he must exercise a greater degree of care before attempting to cross the track than if there had been nothing to interfere with his sight or hearing.   (*Post, pp.* 204-205.)

Cases cited and approved:    Railroad v. Weaver, 9 Lea, 47; Phillips v. Railroad, 111 Mich., 274; Merkle v. Railroad, 49 N. J. Law, 473.

**6. CHARGE OF COURT. On assumed facts not in evidence, if prejudicial, is reversible error.**

An instruction to the jury upon assumed facts which do not exist in the evidence and which are clearly disproved by all the evidence if prejudicial to the losing party is reversible error. (*Post, pp.* 205-208.)

Cases cited and approved:    Railroad v. Winters, 85 Tenn., 240; O'Rourke v. Railroad, 103 Tenn., 124; James v. Bank, 105 Tenn., 3; Railroad v. Houston, 95 U. S., 703.

Railroad v. Satterwhite.

**7. SAME.** That jury shall allow punitive damages, which are discretionary, is reversible error.

The allowance of punitive, exemplary, or vindictive damages, when warranted by the facts, is left to the sound discretion of the jury; and an instruction to the jury that, if they find the negligence of the defendant was gross or wanton, they "should make proper additions" by way of punitive damages, is reversible error in making the assessment of punitive damages compulsory and not discretionary. (*Post, pp.* 208-213.)

Cases cited and approved: Ferguson v. Moore, 98 Tenn., 342; Railroad v. Brooks, 83 Ky., 129; Robinson v. Superior, etc., 94 Wis., 345; Day v. Woodworth, 54 U. S., 371; Hooker v. Newton, 24 Wis., 292.

Cases cited and distinguished: Davidson Benedict Co. v. Severson, 109 Tenn., 572.

**8. VERDICT.** So excessive as to evince partiality, passion, and caprice.

A verdict for $17,000 for wrongful death, where there was contributory negligence on the part of the decedent, is so excessive as to evince partiality, passion, and caprice on the part of the jury. (*Post, pp.* 110, 135.)

---

FROM MAURY.

---

Appeal from the Circuit Court of Maury County.— SAM HOLDING, Judge.

GEORGE T. HUGHES, JOHN BELL KEEBLE, WILLIS BONNER, and PERCY S. CHANDLER, for Railroad.

E. H. HATCHER & SON and H. P. FIGUERS, for Satter-white.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

D. C. Satterwhite, as administrator of Henry Dotterer, deceased, recovered a verdict and judgment in the circuit court of Maury county against the Louisville & Nashville Railroad Company for the sum of $17,000 for the negligent killing of his intestate.

The company appealed, and has assigned errors.

The cause of action was stated in a declaration comprising eight counts, alleging a breach on the part of the company both of common-law and of statutory duty.

It is alleged in the first count that Henry Dotterer was run over and killed on Bluegrass avenue, one of the main thoroughfares of the town of Mt. Pleasant, by one of corporate defendant's trains of cars, while deceased was crossing its tracks. Hobbs and Douglass, conductor and engineer, respectively, of said train, were also made defendants, and it is alleged in said count that the accident was the result of the concurrent and combined negligence and carelessness of all the defendants. It is further alleged in the same count that the deceased left surviving him as his only heirs and next of kin, his widow and two minor children.

The specific ground of recovery alleged in the second count is that the conductor and engineer, at the time of

Railroad v. Satterwhite.

the accident, were running the cars through the town of Mt. Pleasant at an immoderate and dangerous rate of speed across the public streets of said town, as they had been accustomed to do, and that the accident occurred on one of the main thoroughfares of the town, where there was a large amount of public travel, of every character and description; that the defendant company had knowledge of the habit of the conductor and engineer to thus run its trains at this negligent, reckless, and dangerous rate of speed, and had failed and refused to admonish them and give instructions as to the rate of speed at which they should run said cars. This count also alleged that the death of deceased was the result of the joint and combined negligence of all the defendants.

The specific ground of recovery alleged in the fourth count is that the accident was caused by the joint negligence of all the defendants in running said train of cars without sounding a bell or whistle one mile from the corporate limits of Mt. Pleasant, and at short intervals until the train reached the station, in violation of the express provisions of the statute.

It is alleged in the fifth count that the defendant company had negligently parked a large number of box cars upon its side tracks at and near the point where the accident occurred, in such manner as to obstruct the view of the main track from persons approaching it, and that the running of the cars at such reckless and dangerous rate of speed concurred with the obstruction of the view

Railroad v. Satterwhite.

of the main track by the said box cars, so as to constitute the direct and proximate cause of the accident.

When the declaration was filed, and within the time required by law, defendant company, through its counsel, presented a petition to the State court to remove the cause of the federal court, alleging that the controversy was separable, and between citizens of different States. A demurrer was interposed by plaintiff to this petition for removal which was sustained by the circuit judge, and the application refused. Defendant company thereupon filed in the circuit court of the United States for the middle District of Tennessee a certified copy of the record in the State court. A motion was there submitted on behalf of the plaintiff below to remand the cause to the State court, which motion was overruled, and thereupon all of the defendants interposed pleas of not guilty.

At the next term of the circuit court a plea was filed on behalf of the defendant company in which was embodied the action of Judge Clark in refusing to remand the case, as a bar to any further action by the State court. A demurrer was interposed to this plea on behalf of the plaintiff below, which demurrer was sustained by the State court. The defendant company then filed its protest against any further action in the cause by the State court, which protest was overruled, and the cause proceeded to trial in the said court, with the result already announced.

The first assignment or error in behalf of the defend-

Railroad v. Satterwhite.

ant company is that the court below erred in refusing to grant the petition of the defendant the Louisville & Nashville Railroad Company for removal.  The action of the circuit court was based (1) upon the ground that the controversy was not separable, but joint, and (2) that there was no diverse citizenship, since the administrator was a citizen of Kentucky, where the defendant railroad company also resided, notwithstanding the fact that the beneficiaries of the deceased, for whose benefit the administrator sued, were citizens of Tennessee.

The court was of opinion that the citizenship of the administrator, and not the citizenship of the beneficiaries, determined the jurisdiction.  It would seem that Judge Clark, of the United States court, in refusing to remand the cause, was of a different opinion, and retained jurisdiction of the cause.

An examination of the record has disclosed that no bill of exceptions was taken to the action of the State court in dismissing the petition for removal.  The record entry made October 4, 1902, recited that the petition for removal is disallowed, to which ruling of the court the defendant company excepts, and prays that said petition and bond, and the affidavits filed therewith, be made a part of the record in this cause, which is so ordered by the court.  No bill of exceptions embodying the petition, bonds, and affidavits, however, appears to have been taken to the action of the court.

The cause was not heard on its merits until the September term, 1903.  If the plaintiff in error desired to

have the action of the State court on the petition for removal reviewed by this court, it was necessary, under well established rules of practice, to take a wayside bill of exceptions, preserving and embodying in the record the petition, bond, affidavits, etc. In the absence of such a bill of exceptions, there is nothing before this court to review on the subject of removal. *L. & N. R. Co.* v. *Fort* (Dec. term, 1903), 4 Cates, 432, 80 S. W., 429.

Passing now to the merits of the controversy, we find in the record certain facts which are practically undisputed. The deceased, Henry Dotterer, was killed on the afternoon of June 20, 1902, by a north-bound passenger train of defendant, traveling from Sheffield, Alabama, to Columbia, Tennessee, and due to arrive at Mt. Pleasant at five o'clock and thirteen minutes. At the moment he was killed, deceased was in the act of crossing defendant's track at Bluegrass avenue, within the corporate limits of Mt. Pleasant. Deceased was driving in an open buckboard, or no-top buggy, and approaching the track from the east, while the train which caused his death was coming from the south. At the *locus in quo* the railroad track runs north and south, while Bluegrass avenue runs east and west. It appears that the depot is 663 feet north of the avenue crossing, and the corporate limits of the town begin about 1,084 feet south of the crossing. A water tank referred to in the proof is situated at a point 1,209 feet south of the crossing. It appears that on the east side of the railroad track was a series of phosphate

sheds, beginning at a point 135 feet south of the avenue, and extending 700 or 800 feet south towards the tank. These sheds were about 12 feet from the side track, and the side track was about 8 or 10 feet east of the main track. It further appears that on this side track, which extended north and south of Bluegrass avenue, was a long line of box cars, with an opening left on Bluegrass avenue for the passage of travelers along the avenue and across the railroad track. These box cars extended both north and south of the avenue. A public road running nearly parallel with the railroad track, and extending north and south, intersected Bluegrass avenue just immediately east of the railroad track. The proof is that these phosphate sheds obstructed the view of a train approaching from the south to a person traveling on this public road towards its intersection with Bluegrass avenue. It further appears that a line of box cars extending 300 or 400 yards south of the avenue crossing would cut off the view of a train approaching from the south to a person traveling north on this public road towards the avenue. A person traveling on the public road towards Bluegrass avenue would have his back towards a train approaching from the south. It further appears that, four or five car lengths south of where the avenue crosses the railroad track, there was another opening in the line of box cars, 10 or 20 feet in width.

With this description of the place of the accident and

Railroad v. Satterwhite.

its environments, we proceed to notice the immediate facts of the killing.

The deceased was one of the receivers of the American Phosphate Company, and lived at Columbia, but visited Mt. Pleasant daily in the performance of his duties; going out on the morning train, and returning on this train in the afternoon. On the afternoon of the killing, deceased had ridden down to the sheds and office south of Bluegrass avenue, and east of the tracks, probably for the purpose of superintending the weighing of some phosphate rock upon the scales, and the performance of his accustomed duties. It appears that, while deceased was in the office, one Herzell said, "Old man, you have just got five minutes to make that train." And in reply, deceased said, "Well, I must be going." He then stepped out of the office, and on his way had some conversation with Mr. J. W. Jones, during which time the railroad whistle blew. Mr. Jones, who was introduced as a witness by the plaintiff, and who was engaged in talking to deceased at the time, testified as follows:

That they were standing 70 or 80 yards from Bluegrass crossing, south of the avenue; that he heard the whistle, and supposed the whistle was near the water tank. He states that deceased's buggy at that time was standing under the shed, headed south, and that, when the whistle blew, deceased said he would have to catch that train. His language was: "There's my train. I must catch it." The witness further stated that deceased got in his buggy, turned, and, striking the horse

a pretty hard lick, drove off rapidly in the direction of the crossing.

Mr. R. J. Davis, another witness introduced by plaintiff, states that he was standing near deceased at the time, and followed him down the railroad towards the crossing; he (Davis) being in a wagon, only a wagon length behind him. The witness says that, when the train whistled, deceased remarked that "he had to beat that d—— train; if he didn't he was left."

Deceased continued to drive rapidly toward Bluegrass crossing, and turned into the open space between the cars to drive over the railroad tracks, coming upon the main track from behind the cars that were standing upon the track.

The witness Jones, already quoted, further states that he saw deceased turn behind the car, and that, just as his buggy was on the side track, the horse wavered a little, and that deceased struck him with a whip, and that is the last he saw of them.

Other witnesses also testified that they saw deceased strike the horse with the whip when the wheels were on the side track, and this is not a disputed question.

Another witness (Zingerell) states that, as he saw deceased coming across the track, he hallooed at him and waved his hand, calling to him to stop—that the train was coming—but that deceased appeared not to see him, as he was looking towards the depot; that, when he hallooed at deceased, and waved at him, the horse was still inside the side track.

Railroad v. Satterwhite.

P. O. Rosser, on cross-examination, says that he thinks Zingerell and somebody else waved to deceased to go back; that more than one person was waving at him. He heard them call to him, and saw them wave at him, hallooing to him and waving their hands.

J. W. Jones, plaintiff's witness, says that, after deceased left him and drove rapidly toward the crossing, he (Jones) could see the smoke over the cars—there was a tremendous amount of smoke that day—and that he could also see the roofs of the passenger cars. He was standing at the time east of the cars, and on the road along which deceased was driving ahead of him.

Other witnesses saw the smoke and heard the train.

But it seems that the attention of deceased was not attracted to the approaching train, and when he started to cross the railroad tracks his head was turned north, evidently looking toward the depot. He continued to drive his horse directly upon the crossing. It appears in the evidence that a flouring mill situated near the railroad track, and about 100 feet south of the avenue crossing, was in operation at the time of the accident making a great noise; one of the defendant's witnesses saying that it was roaring so loud at the time that it was hard for him to hear the train at all. It may be that this affords an explanation of deceased's inability to hear the train. It further appears that deceased could not see the train approaching from the south until he had passed west beyond the line of box cars, so that he could look southward down the track. There was no flagman

or gates at the railroad crossing, which, in view of its situation and environments, was a peculiarly dangerous one. It is conceded in the proof that, as deceased's horse passed beyond the line of cars from the side track to the main track, the animal wavered or hesitated. Deceased thereupon struck him with his whip, and, rising in his buggy, struck him again, but the horse did not seem to respond. The proof is that at this time deceased's buggy was upon the side track, where he himself could not see an approaching train. When deceased struck the horse the second blow, the animal leaped across the main track, and had cleared it, excepting one hind foot, which was caught and torn nearly off. The engine struck the buggy amidships, and deceased was thrown 10 or 12 feet in the air and fell upon the track immediately in front of the engine. He was instantly killed, and his body dragged 600 feet. It is in proof that when the horse's head appeared beyond the box cars, the engineer immediately applied the air brakes, but, notwithstanding this fact, the train ran 580 feet north of the crossing before it was stopped. Under the rules of the company, an engineer was permitted to run a train at an average rate of 25 miles an hour, with a maximum rate of forty miles. According to the plaintiff's testimony, the train was running at the time of the accident at the rate of twenty-five or thirty miles an hour. It is insisted on behalf of the plaintiff that the speed of the train had not been slackened during its passage through the corporate limits of the town of Mt. Pleasant. This

fact, it is claimed, is shown by the proof, that, at the time the horse's head appeared beyond the line of box cars, the engineer had his hand upon the air brake, but did not succeed in stopping the train until it ran nearly 600 feet north of the crossing.   It is argued that, although the engineer had his hand upon the air brake at the time, the speed of the train through the city limits had not been slackened, or it could have been stopped within a much shorter distance.

As already indicated, one ground of recovery alleged in the declaration was that the company had failed to comply with the statutory regulation requiring the bell or whistle to be sounded at a distance of one mile from the corporate limits, and at short intervals until the train reached the station.   It is conceded that the whistle was blown before the corporate limits were reached, but it is a controverted question as to the exact distance from the corporation the signal was sounded.

The plaintiff's witnesses prove that the following signals were given:   First, at Military Road crossing, which is 5,000 feet from the corporate limits; second, at Killebrew Field, half a mile from the tank, which is 1,180 feet south of the corporate line; third, it whistled about a quarter of a mile from the tank for certain persons to leave the track, and continued to signal nearly to the tank.   One witness introduced by the plaintiff (P. O. Rosser) thinks the bell was ringing as the train came from the tank to the crossing.

It appears that counsel for plaintiff below did not

rely upon the failure of defendant company to comply with the precautions required by subsection 4 of section 1574 of Shannon's Code, which provides as follows:

"Every railroad company shall keep the engineer, fireman, or some other person upon the locomotive, always upon the lookout ahead, and when any person, animal, or other obstruction appears upon the road, the alarm whistle shall be sounded, the brakes put down, and every possible means employed to stop the train and prevent an accident."

On this subject the trial judge, in his charge, stated as follows:

"It is conceded, however, by the counsel for plaintiff in his argument, that this last subsection just read has no application, and plaintiff is not insisting, under the proof, that the defendants are liable for a failure to observe the requirements of this subsection, for it is conceded by counsel for plaintiff that Mr. Dotterer appeared so suddenly upon the track that those in charge of the engine did all that there was time to do, and this is all required by the statute; so that really the only statute for you to consider is that part of subsection 3 of section 1574 of Shannon's Code which provides as follows: 'On approaching a city or town the bell or whistle shall be sounded when the train is at a distance of one mile and at short intervals till it reaches its depot or station.'"

The fifth assignment is based upon the following instructions of the trial judge, viz.:

Railroad v. Satterwhite.

"If you should find that, when Dotterer got into his buggy and drove towards the crossing, he knew of the near approach of the train to the crossing; that he heard the signal for the station, or was otherwise informed of the near approach of the train; and you should further find that, by reason of the obstructions, he could not see the approaching train, and by reason of surrounding noises he could not hear the signals of the approaching train while he was traveling as he was; and you should further find that he took no reasonable precaution before entering upon the track, or within striking distance of it, to ascertain where the train was, and whether it was reasonably safe for him to cross; and you should find that, under these circumstances, he entered upon the track immediately in front of the moving engine and was killed—then he would be guilty of negligence; and, if such negligence was the proximate cause of the accident, or if his negligence proximately contributed to the cause of the accident, or his negligence equally with that of the defendant proximately contributed to the cause of the accident, then the plaintiff cannot recover."

The sixth assignment of error presents a cognate question, and will be considered in connection with the fifth assignment of error, as follows:

"If the jury find that the deceased, Henry Dotterer, knew of the near approach of the train, and heard the signals sounded for the station, or if he was otherwise informed of the near approach of the train, and entered his buggy and drove to the crossing and entered upon

the track just immediately in front of the approaching
train without looking or listening, or taking any other
precaution to ascertain whether it would be safe for him
to cross the track, and should find that the statutory
precautions had been complied with, as you have been
instructed, then the plaintiff could not recover in this
case."

Now, the criticism on the charge given in the fifth
assignment of error is that the jury is left to determine
whether the negligence of the deceased was or was not
the proximate cause of the accident, and whether such
negligence proximately contributed to such injuries,
and whether such negligence, equally with that of the
defendant company, proximately contributed to the ac-
cident.

It is insisted that, upon the hypothesis stated, the
court should have instructed the jury that the plaintiff
was guilty of negligence *per se,* and that this negligence
was the proximate cause of the accident.

It will be observed that the special request set out in
the sixth assignment of error does not embody the doc-
trine of proximate cause, and that question is with-
drawn from the consideration of the jury, and it is as-
sumed therein, as a matter of law, that the failure of
the deceased to look or listen is not only negligence *per
se,* but that it is the proximate cause of the accident.
It will be noted that this special request ignores the
proof of the plaintiff tending to show the running of
the train at an immoderate and dangerous rate of speed

over the crossing, and in failing to provide a flagman or gates. This instruction also ignores the situation of the box cars on the side track, obscuring the view of the approaching train. It is a well-settled rule of law that a railroad track is an admonition of danger, and that it is an act of negligence for a person to go upon such track without looking or listening. This, however, is not an inflexible rule, for there are many conditions and environments that excuse the exercise of this legal duty.

In *Patton* v. *Railroad Co.,* 89 Tenn., 371, 15 S. W., 921, 12 L. R. A., 184, the court said: "The duty to look and listen when going upon a railroad track is a continuing duty so long as one continues upon it, using it as a walkway." But it was held that the peculiar circumstances under which the deceased went upon the track, and the fact that he was crossing a bridge under which there was a waterfall, the noise of which probably prevented his hearing, made an exception to the operation of the general rule.

In *Railroad* v. *Dies,* 98 Tenn., 663, 41 S. W., 862, it was held as follows: "A party can not be required, for instance, to stop or listen, when, on approaching a crossing, he can see a reasonable distance up or down the track, so as to be certain he runs no risk in crossing. He can not be required to listen if he is deaf, or the noise of the surroundings is so great as to preclude all possibility of hearing. He can not be held liable for negligence for failing to look when his view is absolutely

cut off, or so obstructed that he can see nothing until he is entering or has entered upon the track."

'In *Wilson* v. *Citizens' Street Railway Co.*, 105 Tenn., 74, 58 S. W., 334, it appeared: That the plaintiff, who had been injured at a crossing of a street railway, was not familiar with the crossing, and was laboring under a mistake as to the locality of the crossing. The night was dark. There were no houses or lights to warn him of the proximity of the track. That the two roads at their intersection were in a cut from three to five feet high, and the railroad track was level with the road. It was held the duty to look and listen is not an absolute, cast-iron rule of law, which must be applied to all cases, without limitation or exception, and, under the facts and circumstances disclosed in that case, the court was in error in charging that the law imposed upon the plaintiff an absolute duty to look and listen, but it should have been left to the jury to say, in view of the proof, whether plaintiff was guilty of contributory negligence in failing to look and listen. *Railroad Co.* v. *Ives*, 144 U. S., 408, 12 Sup. Ct., 679, 36 L. Ed., 485.

The conditions relied on in the present case to prevent the operation of the general rule that an entrance upon a railroad track without looking or listening is negligence *per se* are (1) that a loud noise was caused by a neighboring flouring mill, that was calculated to, and probably did, destroy the noise of the approaching train; and (2) that the deceased was excused from looking for the reason that the company had allowed its side tracks

to be parked with a string of box cars. It was neces-sary that these extenuating circumstances should be passed upon by the jury in determining the negligence of the deceased in failing to look or listen, and it was beyond the province of the court, in view of this theory of the plaintiff, to adjudge, as matter of law, that a failure to look and listen under such circumstances was negligence *per se*. But on this subject the court very properly charged the jury that if they should find from the proof that the location of the box cars upon the side track obstructed Mr. Dotterer's view of the approach-ing train, or if the noise of the mill or other things ob-structed his hearing, then, under such circumstances, a greater degree of care would also be required of him before attempting to cross the track than otherwise would have been required of him, if there had been nothing to interfere with his sight or hearing.

This instruction should have been given in connection with the court's instructions on the duty to look and listen.

In *Phillips* v. *Detroit Ry. Co.,* 111 Mich., 274, 69 N. W., 496, 66 Am. St. Rep., 392, the court uses this lan-guage, viz.:

"The plaintiff, if he could not see an approaching train, by reason of obstructions, was bound to use greater precautions in nearing the track. A person about to cross a railroad track is bound to recognize the danger, and to make use of the sense of hearing as well as of sight—and, if either sense can not be rendered

available, the obligation to use the other is stronger—to ascertain before attempting to cross whether the train is in dangerous proximity."

*Merkle, Adm'r,* v. *New York R. R.,* 49 N. J. Law, 473, 9 Atl., 680; Thompson on Negligence, sec. 1666; Elliott on Railroads, sec. 1168; *Railway* v. *Weaver,* 9 Lea, 47, 42 Am. Rep., 654.

The seventh assignment of error is based on the following instructions given in the general charge, viz.:

"If, however, you should find that Mr. Dotterer did not know of the near approach of the train, and did not hear the signal for the station, nor was otherwise informed of the near approach of the train; and you should further find that the obstructions did not prevent him from seeing; and you should find that, in the exercise of ordinary care and prudence, he did look, but saw no train; or you should find that the surrounding noise was not such as would prevent his hearing the signals of the approaching train; and you should find that, in the exercise of ordinary care and prudence, he listened for the train and did not hear it, and that, under these circumstances, while in the exercise of ordinary care and prudence, he entered upon the track and was killed then he could not be guilty of negligence. And if you should further find that, under the instructions hereinbefore given, defendant company was guilty of negligence proximately causing the injury, then plaintiff would be entitled to recover."

Railroad v. Satterwhite.

It is insisted on behalf of defendant company that the hypothesis of facts stated in this instruction is not supported by the record: (1) That Mr. Dotterer did not know of the near approach of the train; (2) that he did not hear the signal for the station; (3) that he was not otherwise informed of the near approach of the train; (4) that he did look for the train, and failed to see it; (5) that he did listen for the train, and did not hear it.

The contention on behalf of the company is that these suppositive facts embraced in the hypothetical statement by the court are clearly disproved and overthrown by the plaintiff's own testimony.

The following facts are found in the testimony introduced by the plaintiff below:

That on the day of the accident Mr. Dotterer, in accordance with his usual custom to visit the sheds and offices south of Bluegrass avenue crossing before taking the evening train for his home at Columbia, was in the office, south of the crossing, on the east side of the railroad, talking to one Harris. Mr. Herzell challenged his attention to the fact that he had only five minutes to catch his train for home. He immediately left the office, but stopped on the outside to talk with one Jones a moment about some phosphate rock. While he was thus conversing with Jones the whistle of the approaching train blew in the neighborhood of the tank. Mr. Dotterer remarked: "There's my train. I must get away from here." Or, as one of the plaintiff's witnesses remembered it: "I must beat that d—— train to the

station." He at once entered his buggy, turned his horse's head to the south, and drove rapidly to the crossing.

A line of box cars intervened between him and the main track of the railroad. Mr. Dotterer continued to look north toward the depot even after his horse had turned in upon the crossing, so that he failed to see Mr. Zingerell and other friends who were earnestly warning him back. The plaintiff's witnesses testify that Mr. Dotterer did not look to the south, the direction from which the train was approaching. It appears from the undisputed evidence that his horse wavered at the main track, thus giving him a mute admonition of danger, but deceased immediately rose in his buggy and struck his horse two blows with his whip, thereby forcing the animal upon and across the track. Other persons standing in the immediate neighborhood saw the smoke of the approaching train over the tops of the intervening box cars, and others even saw the roofs of the passenger coaches. Numbers of witnesses saw the train, and others saw the signals that were being made to Mr. Dotterer to warn him back from the track. We fail to find, upon examination of the evidence, any facts upon which the court based the hypothesis submitted by him in the instruction embodied in the seventh assignment of error.

In *Railroad* v. *Houston*, 95 U. S., 703, 24 L. Ed., 542, it was said: "To instruct a jury upon assumed facts to which no evidence applied was error. Such instruc-

tions tended to mislead them by withdrawing their attention from the proper points in issue. Juries are frequently prone to indulge in conjectures without having possible facts not in the evidence suggested for their consideration. In no respect could the instructions mentioned have aided them in reaching a just conclusion."

In *James* v. *Bank,* 105 Tenn., 3, 58 S. W., 261, 51 L. R. A., 255, 80 Am. St. Rep., 857, the court charged upon facts not in the evidence, and for that reason the cause was reversed.

In *O'Rourke* v. *Street Railroad,* 103 Tenn., 124, 52 S. W., 872, 46 L. R. A., 614, 76 Am. St. Rep., 639, the court said: "In this instance it is not improbable that the jury was misled into the belief of the court that there was evidence on this particular point, and accepted this consideration in making up their verdict; hence the irrelevant instruction may have been in some degree prejudicial to the plaintiff, and its inclusion in the charge therefore noted as one ground for reversal." See, also, *E. T. & W. N. R. Co.* v. *Winters,* 85 Tenn., 240, 1 S. W., 790.

The eighth assignment is that the court erred in its general charge in instructing the jury on the subject of punitive damages, and in refusing to charge the supplemental request submitted by the counsel for the company. In his general charge the court instructed the jury as follows:

"If you should find that the negligence of the defend-

Railroad v. Satterwhite.

ant was gross or wanton, you should make proper additions to the compensatory damages by way of punitive damages; that is, damages by the way of punishment. If, however, you should find that the deceased himself was guilty of contributory negligence, then you must take this into consideration, in mitigation of damages, and make proper deductions for this negligence."

The counsel for defendant company also requested the court to charge as follows:

"I charge you that, under the facts of this case, the plaintiff would not be entitled to recover exemplary damages."

The criticism upon the instruction contained in the general charge on this subject is that the assessment of punitive damages by the jury is made compulsory, and not discretionary.

We are of opinion that this criticism is well taken. It will be observed that the trial judge instructed the jury that, if the negligence of the defendant was gross or wanton, the jury should add damages by way of punishment. The allowance of punitive, exemplary, or vindictive damages, as the term is variously used, is left to the sound discretion of the jury. It has never been supposed that it was within the province of the court to instruct the jury that punitive damages must or should be assessed.

In *Ferguson* v. *Moore,* 98 Tenn., 349, 39 S. W., 342, the trial judge had instructed the jury as follows:

112 Tenn—14

"You may give what is called 'vindictive damages' to punish the defendant, if guilty, and deter others from doing likewise; and it is not only your right, but your duty, to do so."

This court, on appeal, adjudged this instruction to be erroneous, saying, "The giving of vindictive damages is a matter of discretion with the jury, and they should not be told that it is their duty to give them."

The supreme court of Kentucky, in the case of *L. & N. A. R. Co.* v. *Brooks*, 83 Ky., 129, 4 Am. St. Rep., 135, held that an instruction to the jury that they should, under certain facts, if they found them to be true, give punitive damages, was error.

Mr. Sutherland, in his work on Damages, in the last edition, says that:

"In Vermont, Mississippi, Kentucky, Illinois, Missouri, New York, Rhode Island, Tennessee, Wisconsin, Alabama, Maryland, North Dakota, North Carolina, Maine, punitory damages can not be claimed as a matter of right; but it is always a question for the jury, within its discretion, no matter what the facts are." 2 Sutherland on Damages (3 Ed.), sec. 403.

In *Robinson* v. *Superior, etc.*, 94 Wis., 345, 68 N. W., 961, 34 L. R. A., 205, 59 Am. St. Rep., 897, it appeared that the jury had been instructed, in effect, by the trial judge, that:

"If the conductor maliciously put the plaintiff off the car, then he was also entitled to what are called exemplary or punitory damages."

The court said:

"In *Day* v. *Woodworth*, 54.U. S. (13 How.), 371 [14 L. Ed., 181], Mr. Justice Greer, speaking for the court, said 'that in actions for trespass, and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant; having in view the enormity of his offense, rather than the measure of compensation to the plaintiff.' This has always been left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend upon the peculiar circumstances of each case."

Then the court continues, later on:

"It is true that an instruction to the effect that the jury 'ought' to give exemplary damages in such a case was sustained by this court in *Hooker* v. *Newton*, 24 Wis., 292; but the case is not in harmony with the best-considered cases, nor with the weight of authority. Mr. Thompson, in his excellent work, after stating that 'the jury may, if they think proper, give damages by way of punishment,' says: 'It may be stated that, in cases in which such damages may be given, whether they will be given, or not, is a question within the discretion of the jury.' "

The case of *Hooker* v. *Newton*, 24 Wis., 292, referred to herein, was afterwards overruled by the case of *Robinson* v. *Superior, etc.*, 94 Wis., 345, 68 N. W., 961, 34 L. R. A., 205, 59 Am. St. Rep., 897.

American and English Enc. of Law (2 Ed.), vol. 12, p. 51, lays down the following rule:

"The rule that the question of exemplary damages is one for the jury, in the exercise of their discretion has been held to apply, though it was established, in point of fact, that elements existed which would, according to the general rule of exemplary damages, warrant such an assessment. It has been held, therefore, to be erroneous to instruct the jury that, in any state of facts, it is their duty to award exemplary damages, or that they should, will, ought to, or must do so, or, if they find a given state of facts, the plaintiff is entitled to recover such damages; and, so carefully is the discretion of the jury guarded in this particular, it has been declared that an instruction, several times repeated, which seemed to invite the jury to give punitive damages, was erroneous."

It is said, however, that the language now criticised in this instruction was borrowed almost literally from the opinion of this court in the case of *Davidson Benedict Co.* v. *Severson,* reported in 109 Tenn., 572, 72 S. W., 967. It is true, in that case while dealing with the general question of damages, the following language was used, viz.:

"In cases where the negligence of the person that inflicted the injury is gross or wanton, they [the jury] should make proper additions by way of adding punitive damages."

It was not intended by this opinion to lay down any new rule on the subject, else the former cases would have been reviewed and overruled; but no mention is made

Railroad v. Satterwhite.

of former rulings, and it was not supposed that they were invaded. The court, in the use of the word "should," was not laying down a rule to be used by the trial judges in instructing juries on the subject of the assessment of punitive damages, but was rather enumerating the different classes of damages, and stating the grounds. upon which punitive damages might be superadded to actual compensation. Moreover, it appears from an examination of the opinion that there was no assignment of error on the subject of punitive damages, and that question was not before the court for determination.

The last assignment is the verdict is so excessive as to evince partiality, passion, and caprice on the part of the jury. We are constrained to believe, in view of the contributory negligence on the part of the deceased, that this assignment is well taken. For the errors indicated, the judgment is reversed, and the cause remanded for a new trial.