GARNETT SMITH GIFFORD v. PROVIDENT LIFE INSURANCE COMPANY.

Middle Section. December 23, 1932.

Petition for Certiorari denied by Supreme Court, March 18, 1933.*

*(Note: On June 24, 1933, petition for a rehearing granted, and decree of Court of Appeals was modified so as to allow interest only from date of filing proofs of loss with the company.)

Sizer, Chambliss & Sizer, of Chattanooga, for appellant Insurance Co.

John T. Raulston, of South Pittsburg, for appellee Gifford.

CROWNOVER, J. . The original bill in this cause was filed by complainant, Mrs. Gifford, for the purpose of collecting one thousand dollars, the proceeds of an insurance policy on the life of her dead husband, Jesse Owen Gifford, an employee of King, Dobbs & Co., of Chattanooga, payable to her as beneficiary.

The defendant answered and admitted the issuance of the policy, but denied that it was indebted to the complainant in any sum: (1) Because the insured was not an employee of the King, Dobbs & Co., at the undetermined time of his alleged death, according to the terms of the policy. (2) Because no satisfactory proof of death, giving the time and circumstances, was submitted to defendant Insurance Company.

The complainant demanded a jury, and two issues of fact were submitted to the jury:

"1. Is Jesse Owen Gifford, who was insured under individual certificate No. 30, as the employee of King, Dobbs & Co., deceased?

"2. If you find and answer that he is dead, about when did he die?"

The parties stipulated that the policy sued on was in force up until

midnight on August 13, 1928, and that the employment of Gifford, the insured, terminated at midnight on August 13, 1928.

Counsel for defendant having stated in his argument that he thought that the insured was dead, the court directed the jury to answer the first question in the affirmative. The jury then returned as its verdict that the deceased died "about 10:00 o'clock P. M., August 13, 1928."

The defendant's motion for a new trial was overruled.

The Chancellor held that the complainant was entitled to the proceeds of the policy, and interest, from August 13, 1928; and decreed that the complainant recover the sum of $1227.50 from the defendant.

The defendant's motion for a new trial having been overruled, it appealed to this Court, assigning five errors, which raise but two propositions:

 (1) There was no evidence to support the verdict or the judgment.

 (2) The court erred in overruling defendant's motion for a directed verdict.

The defendant, the Provident Life & Accident Insurance Company of Chattanooga, Tennessee, incorporated under the laws of Tennessee, insured the lives of certain employees of King, Dobbs & Co., of Chattanooga, Tennessee, wholesale grocers, under a group life insurance plan, issued to the employer on January 1, 1928. The life of Jesse Owen Gifford of South Pittsburg, Tennessee, an employee and traveling salesman of King, Dobbs & Co., was insured for the sum of $1000, such insurance to be payable to Garnette Smith Gifford, wife, as beneficiary.

Jesse Owen Gifford, hereinafter to be referred to either as the deceased or as the insured, traveled over the territory of northern Alabama and a portion of southern Tennessee as a salesman for King, Dobbs & Co. The deceased's itinerary usually took him to Stevenson, Alabama, about twice a week. He had been going to Stevenson for many years and always stopped at the hotel operated by E. O. Mann. On the afternoon of August 13, 1928, the deceased went to Stevenson and to this hotel, registered and was assigned a room which he shared with his friend, O. U. Pierce, a salesman for the Cudahy Packing Company. On the evening of August 13, 1928, the deceased did not go to the regular dining room, but had a meal of raw eggs and milk sent up to his room, as he had not been feeling well. He went down to the lobby at about 9:30 P. M., spoke to the proprietor, just as the proprietor was leaving for his home which was a few blocks distant.

On the night of August 13th, sometime after dark and sometime before the 10:20 P. M. train for Memphis arrived at Stevenson, a

man went to the ticket window at the railway station and asked Clouse, the ticketseller, the price of a fare to Memphis. He did not know the man or the time, but a Mr. M. A. Hackworth, an automobile mechanic of the Chevrolet Automobile Company, who happened to be sitting there in the office with Mr. Clouse, stated to Clouse that the man who inquired about the fare was the deceased, and that he was a salesman for King, Dobbs & Co. He thought that the time was between nine and ten o'clock. He says that the deceased went on up the railroad tracks and that he had not seen him since. He thought that he was wearing a dark suit at the time.

The conductor of the train going toward Memphis says that on the night the deceased disappeared, according to his written record, a man got on the train at Stevenson and paid the $9.90 cash fare plus a 15c penalty, as he did not have a ticket. The conductor had no independent recollection of this passenger, except to the extent the written record refreshed his memory. He says that the passenger had an argument with him about paying the penalty, because he, the passenger, knew that the fare to Memphis from Stevenson was $9.90, but that after he had explained that the railroad always charged a penalty for not buying tickets at the ticket office when the opportunity was presented, the passenger, without further delay or argument, paid the extra amount. The conductor could not describe the man, had no recollection of him except his record, and could not say whether the passenger was Gifford or not, since he did not know Gifford. On his next trip, the inn-keeper, Mann, asked him if the deceased had ridden with him on the last trip, but he did not know and could only tell about collecting a single cash fare, and having a friendly argument about it, but could not describe the one with whom he had the dispute.

One Willis Kirk, a boy who lived near Stevenson, testified that he saw the deceased board the 10:20 P. M. Memphis train. But the jury evidently did not accept Kirk's testimony at its face value. Kirk was an ignorant farm hand; he testified that he saw the deceased come out of the station and get on the train. He said that he knew the deceased well, that he had ridden in his car many times, and they were good friends; but when he was asked to describe his friend Gifford's appearance, the color of his hair, his eyes, etc., he was unable to do so, or even to give the capacity of the car that he said he had ridden in so often. He said it was a two-seated sedan. Kirk went to work for Bryan Bean on Bean's farm. Bean was a friend of Arthur Woodall, who was afterwards charged with the murder of the deceased. Kirk did not tell anyone about seeing the deceased get on the train until two or three years afterwards, when

Woodall was tried; then he told Bean about it, when Bean was looking up evidence for Woodall.

Nothing more was ever heard of Owen Gifford. Next morning, his room-mate went down and inquired about him, but to no avail. His grip was in his room where he had left it. His car was parked across the railroad tracks from the hotel, where he usually left it—but with the ignition wires cut. Owen Gifford had completely disappeared.

Inquiries were immediately made by the proprietor of the hotel. Gifford's half-brother went to Stevenson and took his grip; King, Dobbs & Company put another salesman on his route.

When his absence was discovered, the hotel-keeper remembered that the deceased had been shot at by one Arthur Woodall about ten days before, when he was at Stevenson on a previous trip. The deceased had been sitting in the swing at Woodall's house with Woodall's wife, and Woodall had come through the house and onto the porch and had shot at the deceased, and the bullet had grazed the top of the deceased's head, but without serious injury. They were supposed to have made up after this. The inn-keeper asked Woodall if he had seen the deceased, but Woodall denied vigorously that he had seen him again.

Clarence Cargile, who lived within sight of Woodall's house in Stevenson, had already undressed and gone to bed on the night of August 13, 1928, when he was startled by a shot or shots over at the Woodall home next door. He got up and called his mother and they went out on their front porch. He saw lights in the Woodall house, but they were immediately switched off, and the house was left in darkness. Cargile judged that this happened at approximately ten o'clock, for he heard the Memphis train arrive at the station.

Anna Maud Lily lived about a hundred yards away from the Woodall home. Between ten and eleven o'clock on the night of August 13, 1928, she was awakened from her sleep by a shot or shots over in the general direction of the Woodall home. Her husband got up and made an investigation, but found nothing.

On the night of August 13, 1928, Miss Maud Gossett, now Mrs. Hammon, was walking home from a picture show, when she was met by Pat Jackson, who was employed at the Hammon Filling Station, which was near the Woodall home. She stopped to talk with Jackson. She testified that it was sometime between nine-thirty and ten o'clock. They heard a shot in the Woodall home, then a woman's scream, then a great uproar or "lumberment" of overturning chairs and tables, then the lights went out in the house, and nothing further was heard.

Jackson had passed the home of Woodall but a few moments before, and had seen a blue Chevrolet coupe parked in front of the

house; he took this to be the deceased's car. He had known the deceased very well, had often ridden with him, and knew his car well. He testified that it was a blue 1928 model Chevrolet coupe, which was just like the one deceased had owned at the time of his death. He thought it was Gifford's car when he passed by it. Soon after the shots and the "lumberment," he saw someone come out of the front door of the house. He testified "I could see the bulk of them, couldn't tell who it was—and got in a car that was sitting in front of the house."

Jackson and Mrs. Hammon (then Miss Gossett) paid no further attention to the matter after the noise ceased, since they heard nothing more to arouse their curiosity or suspicion, and soon thereafter they parted.

On April 9, 1931, a dead body was found in the Tennessee River at Bridgeport, Alabama, by two small boys, who immediately reported the fact to the coroner, who summoned a jury to examine the body. The body was examined by Dr. W. C. Williams, a practicing physician, and was then buried. On April 15, 1931, further evidence was discovered as to the identity of the body, and it was exhumed. After three other doctors and the complainant had viewed the remains, the taking of evidence was resumed on the 16th of April, and on that day the coroner's jury rendered the following verdict: "That the body found in the Tennessee River on April 9, 1931, was that of a white man, and that he was murdered by some person or persons unknown to us, and we are unable to state just when or where the crime was committed. From the evidence produced we further believe the body to be that of Owen Gifford of South Pittsburg, Tennessee."

The body was badly decomposed when it was discovered in the river. One cheek was intact, however, and a patch of skin on the back which contained a scar running diagonally to the backbone remained. All of the teeth were intact, and the round skull (the deceased had a round head) had bullet holes through it, probably caused by a shot gun fired at close range going through the temple and coming out through the eye. One leg and one arm were gone and there were marks at these points indicating that weights had been attached thereto to hold the body down, and that they had pulled off these limbs. The body was dressed in a white broadcloth shirt, with a black tie, pin-point striped trousers with an elastic waistband, and a black leather belt. The body appeared to be that of a man about six feet tall and weighing around 190 or 200 pounds.

A dentist who had fixed some teeth for Gifford about twelve years previously, examined the body and stated that he thought that he had

worked on those teeth, since they showed a particular method of cutting that he alone had formerly employed.

Gifford's family physician testified that he had treated a knife wound in Gifford's back which was located at the same place where the scar was found in the back of the body.

Gifford had been wearing a dark blue suit when he left home, and this body had on trousers with pin-point stripes. But C. C. Lloyd, a dry goods clerk of Bridgeport, testified that on the day of his disappearance, Gifford had torn his blue trousers and had come into his store and purchased a pair with that variety of stripe, with that model of elastic waist, and cut from that texture of cloth.

No one of that description in that region had disappeared except Owen Gifford, the deceased, and the coroner's jury gave as its verdict that the body was that of the deceased.

The man who took the body out of the river and who had taken a number of other bodies out of the river, testified that in his opinion this body had not been in the river more than a few months at most, and Owen Gifford disappeared on August 13, 1928. He testified that there was a rumor around the town of Stevenson that Gifford's body had been put in brine and stored in the ice house and that Allison, the manager of the ice house, had committed suicide from worry over having the body of Gifford stored in the ice house; that in his opinion the body had been preserved in some briny substance and had been but lately put into the river.

1. The two assignments of errors, that there is no evidence to support the verdict, and that the court erred in overruling defendant's motion for a directed verdict, in effect raise the same question. As it appears in the statement of facts hereinabove set out, there was sufficient evidence to carry the case to the jury and the motion for a directed verdict was properly overruled.

The complainant's theory is that the assured, Gifford, was shot in the head or struck on the head with a pistol by Arthur Woodall some ten days previous to his disappearance, when he was talking to Woodall's wife at Woodall's home in the town of Stevenson, and that Woodall had ill feeling toward the assured, but their differences had apparently been adjusted; that on his last trip to Stevenson, when Gifford disappeared, he had registered at the hotel and had left his grips in his room; that he stayed about the hotel until about 9:30 or 10:00 P. M. when he went out in town; that thereafter a Chevrolet coupe automobile which much resembled Gifford's car was seen parked in front of the Woodall home. Several people heard a shot or shots fired shortly thereafter in Woodall's home at about ten o'clock P. M. They heard a woman scream and heard a noise or "lumberment" as if furniture was being turned over in the Woodall house, and the

lights immediately went out. Somebody immediately came out of the Woodall home and entered the automobile and drove off toward the hotel. Gifford's car was found parked across the railroad tracks from the hotel next morning, with the ignition key in the lock and all the ignition wires cut. Gifford was not seen alive again after that night. A body was found in the Tennessee River near Bridgeport more than three years later, and there was much evidence that it was the body of Gifford. The skeleton was about the same height as Gifford, it had a peculiarly round head like that of Gifford's. The dental work on the teeth was peculiarly done, in the manner of that done on Gifford's teeth. There was enough skin on the back of the skeleton to show a scar diagonally across the back towards the back-bone in the same place and manner as a cut received by Gifford on the back. The skeleton was clothed in trousers made of tweed or "Keep-cool" material of brown cast with pin-point stripes like those purchased by Gifford and worn by him on the last day that he was seen alive. The skull of the body found in the river had bullet holes showing that he had been shot with a pistol in one temple and the bullet had come out of the other eye, and had also been shot in the eye with a shot gun and the load of shot had gone out of the back of the head tearing a hole two inches in diameter, the muzzle of the gun being possibly four or five inches from the skull when the load was discharged; hence it was evident that death was instantaneous. The body had the appearance of having been preserved in brine, as the skin when exposed to the atmosphere dried out showing salt. Therefore the complainant insists that under this state of facts the assured was killed at about ten P. M. on the night of August 13, 1928.

On the other hand, the defendant's theory is that Gifford went to the waiting room before the Memphis Special train arrived and inquired the price of a ticket to Memphis and was told that it cost $9.90, but he did not purchase a ticket. When the train ran at 10:25 he was seen to enter the door of the train and the conductor collected one fare of $10.05 from one passenger to Memphis on that night. The passenger had an argument with the conductor and insisted that the fare was only $9.90, but after the conductor had explained to the passenger that he would have to pay a penalty of fifteen cents required by the railroad where he had not purchased a ticket, the passenger was satisfied and paid the fare. Therefore, the defendant insists that Gifford was seen after the incident at Woodall's house had occurred and that he entered the train and left the town of Stevenson, and therefore there was no proof that he was killed or died before midnight of August 13, 1928. It also insists that there is no proof that Gifford was at Woodalls' house that night, or that anybody was killed, and that the whole matter of his death is speculation.

There was proof introduced on both theories, but the jury accepted that of the complainant and decided the issues in her favor. We think that the facts proven by the complainant show such a chain of circumstances as to the cause of Gifford's death that is beyond the range of speculation, and that there is material evidence that Gifford not only disappeared but that he is dead and that the body found in the river was his body and that the wounds in the head were such as to have caused his death. There is no proof that anyone had any ill-feelings towards him other than Arthur Woodall. The occurrences in Woodall's house at 10:00 P. M. on the night on which Gifford disappeared were such as to connect Woodall with the death of Gifford, or at least the proof of all this chain of circumstances was sufficient to carry the case to the jury and is some evidence to support the verdict of the jury that Gifford died at 10:00 P. M. on the night of August 13, 1928. We think there was evidence to support the verdict and these assignments of errors must be overruled.

The defendant insists that a theory cannot be established by circumstantial evidence unless the circumstances are shown to be not only consistent with such theory, but absolutely inconsistent with any other rational theory. We hold that this is not the law in Tennessee in civil cases. Evidence in civil cases, which, taken as a whole, satisfies the minds of the jury that the fact is as they find it, is sufficient. The evidence need not rise to that degree of certainty which will exclude every other reasonable conclusion. The evidence in civil cases need only preponderate in favor of a theory and this applies to facts established by circumstantial evidence as well as by direct and positive evidence of witnesses who know the facts. Harriman & Northeastern Railroad Co. v. J. S. McCartt, Roane County Law, 1932, 15 Tenn. App., 109.

> "The true statement of the rule is that if the evidence preponderate in favor of any contention of the plaintiff or defendant, that contention may by the jury be considered as sufficiently sustained to rest a verdict upon, and it is not necessary that the evidence should go so far as to make said contention clear and plain or establish it in a sense to make it free from doubt or uncertainty or set the minds of the jury at rest and convince them absolutely of the truth of the contention. After all the evidence that can be produced is introduced, the jury may still be unsatisfied—not convinced, their minds may not be at rest, they may not be freed from doubt, uncertainty and suspense, but still the jury may recognize that there is a preponderance of evidence, and on that they may base their verdict." Knights of Pythias v. Steele, 107 Tenn., 1, 10, 63 S. W., 1126.

2. It is insisted by the defendant that there was no satisfactory

proof of the death of the assured while the policy was in force furnished by the beneficiary to the Insurance Company before suit was brought, and therefore complainant cannot maintain this suit. We think that this insistence is not well made for the reason that it appears that the policy and the proof of death were read to the jury, but they were not preserved in the bill of exceptions. There is an insurance policy and proof of loss attached to the record but not made a part of the bill of exceptions, and none of these documents are identified or authenticated by the trial judge; hence, these documents are not part of the record in this court and cannot be looked to as evidence. Cosmopolitan Life Insurance Co. v. Woodward, 7 Tenn. App., 394. They were not marked filed.

The bill alleged that the assured had a policy on his life for $1000 payable to his wife, the complainant, when he died, and the defendant admitted in its answer the issuance of the policy, but denied that it was in force when the assured died and denied that satisfactory proof of loss had been filed. It was stipulated that the policy was in force until, and that Gifford's employment terminated at, midnight on August 13, 1928. The policy and proof of loss not being in evidence we cannot look to the documents to see whether the policy required satisfactory proof of loss, and we cannot look to the proof of loss to see whether it should have been satisfactory to the insurance company. The fact that the bill of exceptions contained the statement that it contained all the evidence, will not be considered if it is apparent that this statement is untrue, and the bill of exceptions not being complete we must assume that the proof was sufficient to sustain the verdict and judgment. Cosmopolitan Life Ins. Co. v. Woodward, supra. Of course where a jury is demanded in a chancery suit it is tried according to the forms of law. Code, sec. 9037.

It results that the assignments of errors must be overruled and the judgment of the lower court affirmed. A judgment will be entered in this court for the complainant, Mrs. Gifford, and against the Insurance Company and the surety on its appeal bond for $1227.50 with interest thereon from June 22, 1932, to the present. The complainant's solicitor, John T. Raulston, is decreed a lien upon the recovery for his services in this cause, the same having been so decreed by the chancellor. The cost of the cause including the cost of the appeal is adjudged against the defendant Insurance Company and the surety on its appeal bond.

Faw, P. J., and DeWitt, J., concur.