PHILLIPS et al. v. NEWPORT et ux.—187 S. W. (2d) 965.

Middle Section.   February 24, 1945.

Petition for Certiorari denied by Supreme Court, May 15, 1945.

188

190

Homer Weimar, Joe Brown Cummings, and Albert Williams, all of Nashville, for plaintiffs in error.

Willard Hagan, of Lebanon, and David M. Keeble and Walker & Hooker, all of Nashville, for defendants in error.

HICKERSON, J. Elam J. Newport and his wife, Marian Newport, brought this suit against H. Dayton Phillips and Garner Robinson, doing business as Phillips-Robinson & Company, to recover compensatory and punitive damages for an alleged unauthorized autopsy upon the body of plaintiffs' infant son. Defendants pleaded not guilty. Judgment for plaintiffs was entered upon a verdict of the jury in the sum of $2,000 for compensatory damages and $2,000 for punitive damages, making a total judgment of $4,000. Defendants appealed in error to this court.

The assignments of error raised five questions which we state affirmatively:

1. The court erred in permitting Dr. Lillard Sloan to testify, as a fact, that an autopsy had been performed on the body of the infant child.

2. It was error to permit expert witnesses to testify that, in their opinion, an autopsy was performed.

3. The motion for directed verdict should have been sustained because there was no material evidence to support the verdict.

4. The trial court failed to deliver a written charge to the jury upon the request of defendants.

5. The verdict was so excessive as to show passion, prejudice and caprice on the part of the jury.

These questions will be determined in order.

In this opinion we shall refer to the various incisions, or cuts, which appeared on the body of this infant child, as an operation, or operations. There is only one ultimate issue of fact in the case: Were the operations on the body of this child made for the purpose of a post-mortem examination, or for the purpose of embalming the body? It is not a malpractice suit. If the operations were done

for the purpose of embalming the body, plaintiffs cannot recover, even if such operations were unnecessary and were negligently done. So, in the last analysis, the question is this: Was an autopsy performed upon the body of this child?

1. Defendants complain that the trial judge permitted Dr. Lillard Sloan to testify, as a fact, and not, as an opinion, that an autopsy was performed. The following testimony is set out, in the assignment which raises this question, as the objectionable testimony:

"Q. State whether or not, from what you saw, rather, from what you have testified here in your deposition, that at the time you and Dr. McFarland made the examination of this child's dead body, that an autopsy had been performed. A. Shall I answer it?

"Q. Yes, sir. A. Yes, sir."

We do not construe the entire testimony of Dr. Sloan to mean that he testified, as a fact, and not, as an opinion, that an autopsy was performed. Immediately following the foregoing testimony, about which defendants complain, this question and answer appear:

"Q. So that there can be no doubt about it— A. That was our opinion, that a post-mortem had been held."

This testimony, when considered as a whole, clearly shows, because it specifically states, that it "was our opinion, that a post-mortem had been held."

2. Defendants also assign as error that expert witnesses were permitted to testify that, *in their opinion*, an autopsy had been performed. The basis of this assignment is stated in defendants' brief to be that: "Such testimony was incompetent and prejudicial to the rights of defendants because thereby, and without the necessity for a reliance upon the opinion of others, the jury was

allowed to receive as evidence the opinion of witnesses upon the single and ultimate fact which the jury was called upon to determine.''

There are decisions of our Supreme Court which lend support to this contention of defendants. Cumberland Telephone and Telegraph Co. v. Peacher Mill Company, 129 Tenn. 374, 164 S. W. 1145, L. R. A. 1915A, 1045; Bruce v. Beall, 99 Tenn. 303, 41 S. W. 445.

These decisions, however, have been qualified and the broad statement of the rule therein has been limited in other decisions of that court. National Life & Accident Insurance Company v. Follett, 168 Tenn. 647, 80 S. W. (2d) 92; Moon v. State, 146 Tenn. 319, 242 S. W. 39; McCravy v. State, 133 Tenn. 358, 181 S. W. 165; Mayor, etc., Knoxville v. Klasing, 111 Tenn. 134, 76 S. W. 814; Knights of Pythias v. Steele, 108 Tenn. 624, 69 S. W. 336; see also 32 C. J. S., Evidence, secs. 472-473.

In National Life & Accident Insurance Company v. Follett, supra [168 Tenn. 647, 80 S. W. (2d) 95], the court said that ''the true rule'' on this question was stated in McCravy v. State to be that, 133 Tenn. 358, 368, 181 S. W. 168: ''Testimony is permissible allowing an expert to state a conclusion or give an opinion on a subject which is peculiarly a matter of superior knowledge on his part, for the reason that the lay mind is not so competent to form an opinion or reach a conclusion. Such expert opinion or conclusion, however, may be permitted only in matters peculiarly within the knowledge of an expert.''

In the Follett case, the court reviewed various decisions in this state, and in other jurisdictions, and made these statements in regard to the admission of the opinion of experts upon the issue to be determined by the jury:

''In so far as the questions propounded to the doctors called for an expression of opinion upon the very issue

to be determined by the jury, we think that the questions were clearly unobjectionable. This is true because the issue to be determined by the jury, the cause of death, could not be intelligently determined, either by jury or judge, without the aid of medical advice.

．．．．．．

"If special or expert knowledge is necessary for the proper determination of the cause of a condition, we see no reason why such evidence should not be admitted just as in a case where such evidence is necessary to determine the existence of the condition itself.

"Decisions of this court do not support the idea that expert evidence as to causation is inadmissible.

．．．．．．

"If it is necessary for a jury to have the advice and opinion of an expert witness in order to draw a proper conclusion from certain facts, a definite and positive expression from such a witness would be much more helpful to the jury than a qualified expression. The opinion is not to be received at all upon an ultimate issue of fact, if the jury is qualified to pass upon such an issue. However the opinion be phrased or formulated, it remains an opinion, which the jury is at liberty to reject. To restrict the expert's expression, however, to the subjunctive mood in addition to detracting from the force of the opinion tends to confuse the jury in weighing the testimony of the witness. Such mode of expression indicates that the witness lacks conviction when, as a matter of fact, he may be entirely convinced."

There seems to be no doubt about the law on this question as declared by this latest decision of our Supreme Court: An expert may express an opinion upon the very issue to be determined by the jury if that issue could

not be intelligently determined by the jury without the aid of expert advice.

██ The application of this rule must be determined by the facts of each particular case. It is often difficult to say whether expert advice is necessary to help the jury determine the issue. In such close cases, we think some discretion should be given the trial judge. Here, the trial judge permitted the expert witnesses to express opinions upon the issue to be determined by the jury, to-wit: Was an autopsy performed? We find no error in that ruling. Few subjects are more complicated or technical than post-mortem examinations and embalming. The layman knows nothing about them. Highly technical operations and intricate processes are involved in both. Doctors and embalmers who have given many years of study to these subjects could enlighten a layman in regard thereto. They know what is necessary to be done, how it should be done, how it was done, and can certainly be in much better position to express an opinion as to why these operations on the body of this child were performed than the laymen in the jury box.

3. Did the trial court err in refusing to direct a verdict for defendants?

Plaintiff's case is based on circumstantial evidence, because no eyewitness was introduced who testified that an autopsy was performed. The defense is based on circumstantial evidence and direct evidence, because defendant, H. Dayton Phillips, testified that he performed all the operations on the body; and that they were performed for the purpose of embalming the body, and not for the purpose of a post-mortem examination.

Material evidence was introduced to support the following facts: Elam J. Newport, Jr., who was the infant-

son of plaintiffs, died as the result of taking forty-five aspirin tablets of five grains each. He was one year, ten months and ten days old when he died. The body was removed from Madison Sanitarium, where he died, to the funeral home of defendants. Plaintiffs instructed defendants to embalm the body and prepare it for burial. No permission was given for a post-mortem examination.

The body was received by defendants in good condition with no incisions on it and within thirty minutes to an hour after he died. The death occurred on June 11, 1943, about eleven o'clock in the forenoon. Between seven thirty and eight o'clock that night the mother went to the funeral home. The body was lying in a small bed and was covered by a sheet, except the head. She was requested by defendant, Phillips, not to remove the sheet. She did not know at that time what operations had been performed upon the body of her baby.

The next morning, June 12th, the mother and father returned to the funeral home with some clothing for the baby. A lady who worked for defendants tried to persuade the mother not to dress the body, saying it would upset her; but the mother insisted on dressing it. They put the socks on the child without removing the sheet. At that time the mother was called to the door by a lady who had come to see the body. When she returned to the body, the attendant had put the pants on the child, and had his arm from under the sheet. The mother pulled the sheet back and saw incisions on the body of her child. She stated: ''I just held the sheet in my hand, I looked at him, and said, 'somebody cut on my baby.' '' Defendant, Phillips, explained to her that she had nothing to worry about, that what was done had been done because he had found the body extremely hard to embalm.

After the funeral plaintiffs became so nervous, worried and upset over the condition of the body of their baby that they had it disinterred by an undertaker named J. L. Bass; and an examination of the body was made by this undertaker and Dr. Sam McFarland and Dr. Lillard Sloan to see if an autopsy had been performed upon the body.

This examination was made at the funeral home of J. L. Bass. Mr. Bass opened the casket and removed the clothing from the child. The body was not removed from the casket. These two doctors were present at the time the examination was being made. Mr. Bass was out of the room some of the time.

Incisions were made from near the point of each shoulder to the center of the breast bone where they met. These incisions made a V shaped mark on the body. The ribs had been removed from the breast bone, so this V shaped part of the body was completely detached from the rest of the body. From the point where these incisions met, a long incision was made down the front of the body completely to the pelvis bone. These operations left the body wide open from the pelvis bone to the neck. The stomach, heart, liver, lungs, intestines, and one kidney were completely detached from the rest of the body. The organs which were in the body at the time this examination was made were removed from the body by these doctors. They did not find the liver and stomach.

The doctors who made this examination testified that, in their opinion, an autopsy was performed on the body of this baby.

Defendant, Phillips, took issue with the foregoing conclusion of fact, but admitted that substantially all these operations were done. He testified that he personally did

198

these operations, and that they were necessary to embalm the body.

To embalm a body the blood is removed from the circulatory system and embalming fluid is put into this system in the place of the blood. Blood is circulated through the body by means of arteries and veins. Arteries take blood from the heart and veins take blood to the heart. For each artery there is a corresponding vein. They are located next to each other with the blood stream passing |through them in opposite directions. Wherefore, to embalm a body an artery and the corresponding vein are opened. An instrument is placed into the vein to draw the blood from the body, and another instrument is placed into the artery to force the embalming fluid into the circulatory system as the blood is drawn out. The usual, conventional, customary method of embalming a body is to embalm it through the axillary artery and vein, which are found under the arm; or through the femoral artery and vein, which are found in the thigh of the leg; or through the carotid artery and vein, which are found in the neck. Practically all bodies are embalmed in one of the foregoing ways.

It is more difficult to embalm a baby than it is an adult, because the arteries and veins are so small and tender. In extreme cases of babies, and of adults, the body is embalmed through the abdominal aorta. These blood vessels lie near the lower part of the abdomen close to the backbone. An incision of two to six inches in the abdomen is necessary for this operation. A removal of all the organs of the body is not necessary to embalm a body through the abdominal aorta.

Standard text books teach that a body may be embalmed by going to the arch of the aorta which is located

at the upper end of the heart near the neck. To embalm a body through the arch of the aorta it would be necessary to remove the breast bone as that operation was performed on this body, but it would not be necessary to remove all the organs of the body, which were removed in this case; however, that might sometimes be done.

Defendant did not attempt to embalm this body through the axillary artery, or the femoral artery, or the carotid artery. He had received information that in treating the child the doctors and nurses had experienced difficulty in getting fluid into the veins of the child. He testified that he first attempted to embalm the child through the abdominal aorta, but found the circulatory system blocked by blood clots which he could not remove, so he performed the operations herein detailed and embalmed the body through the arch of the aorta. He did not call the parents of the child and tell them that these numerous and severe operations on the child were necessary to embalm it. He further testified that the stomach and liver of the child were not removed and taken away, but that every organ of the child was placed back into the child's body after it was embalmed. All the outward incisions were sewed up before the body was dressed for burial.

Several undertakers and embalmers testified in the case with experience ranging as high as forty-one years. They all stated that a body could be embalmed through the arch of the aorta, but they had never found it necessary so to do in their whole experience.

Defendants contend that the testimony of Dr. Sam McFarland and Dr. Lillard Sloan that they did not find the stomach and the liver of the child was negative testimony which had no probative value, and was not sufficient to take the case to the jury on this issue of fact:

That the stomach and the liver were not in the body at the time these doctors made their examination. This question of fact is most important in this case, because these doctors testified that in making a post-mortem examination it would have been an important part of the examination to take the stomach and the liver to a laboratory to be examined by a technician.

Plaintiffs contend, to the contrary, that this testimony is not strictly negative in its character in view of all the facts and circumstances surrounding the testimony, and that it has sufficient probative value, whether negative or positive, to be submitted to the jury on the question sought to be proved by it. We think the contention of plaintiffs is sound. The body had been opened to see if an autopsy had been performed on it. Defendant, Phillips, testified that he removed all these organs from the body including the liver and stomach and put them in a bucket while he was embalming the child, and then put them back into the body after it was embalmed.

Whether this testimony of Dr. Sloan and Dr. McFarland is considered as positive or negative, we think it is sufficient to take the case to the jury on the issue sought to be proved by it under all the circumstances. The liver and the stomach had been detached from the body. These doctors had every opportunity to see the stomach and liver when they took the organs which had been detached from the body out of the body and handled them and put them back into the body. With that opportunity to see and know whether the stomach and liver were gone, they testified that they did not find them in the body.

In 32 C. J. S., Evidence, sec. 1037a, this rule is stated: "So also, where a witness who had a more or less ade-

quate opportunity for correct observation testifies that he was attentive but did not see or hear a certain thing, his testimony is sometimes regarded as negative testimony, although it is not of a purely negative character. On the other hand, testimony of a witness that he did not see or hear something which he would have seen or heard had it occurred has been regarded as positive testimony, although the witness admitted that he was not paying particular attention.''

Also in 32 C. J. S., Evidence, sec. 1037b, it is said: ''The negative character of evidence has been said to affect its weight and sufficiency. While there have been statements to the effect that negative evidence is entitled to no weight, the more common view is that it is not necessarily destitute of probative value, but is entitled to consideration, and, where the facts justify it, is substantive evidence of a fact, and may be sufficient to raise or establish an issue or support a finding. Its probative force depends largely on circumstances, and more particularly on the likelihood that the witnesses would have observed the fact had it occurred.''

With this evidence being sufficient to support a finding by the jury that the stomach and liver were not in this body when Dr. Sloan and Dr. McFarland made their examination, was material evidence introduced to support the conclusion which the jury reached that an autopsy was performed; and that the operations on the body of the child were not made for the purpose of embalming it?

Defendants' theory of the motion for directed verdict is that the circumstances which were proved are such as usually attend a post-mortem examination; but they do not *tend to exclude* defendants' theory that the operations were performed for the purpose of embalming the

body. Wherefore, defendants urge that such circumstances constitute no proof whatever.

The meaning of the words "tend to exclude" is necessary to a consideration and a determination of defendants' insistence. "Tend to exclude," as this term is used in decisions relating to circumstantial evidence, does not mean that the proved circumstances must be inconsistent with other contrary theories. It is sufficient if such facts and circumstances create a preponderance of evidence in favor of the fact to be proved and against contrary hypotheses. If the evidence preponderates in favor of plaintiffs' theory, such evidence "tends to exclude" defendants' theory, because the theory of plaintiffs is more probable than the theory of defendants.

Any fact may be proved by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. In civil cases facts are proved by a preponderance of the evidence. If unequal conflicting probabilities, or unequal inconsistent theories are shown by the evidence; or if the minds of reasonable men might differ from the proved facts as to whether the conflicting probabilities, or inconsistent theories, are equally supported by the evidence, the case must go to the jury. Law v. Louisville, etc., Railroad Co., 179 Tenn. 687, 699, 170 S. W. (2d) 360; New York Life Insurance Company v. Nashville Trust Co., 178 Tenn. 437, 159 S. W. (2d) 81; Bryan v. Ætna Life Insurance Co., 174 Tenn. 602, 130 S. W. (2d) 85; Knights of Pythias v. Steele, 107 Tenn. 1, 63 S. W. 1126; Pickard v. Berryman, 24 Tenn. App. 263, 142 S. W. (2d) 764; Gifford v. Provident Life Insurance Co., 16 Tenn. App. 21, 64 S. W. (2d) 64; Jones Commentaries on Evidence, Second Edition, Revised and Enlarged, page 23, section 12.

The trial judge should direct a verdict for defendant, and hold as a matter of law that there is no evidence to support the verdict when the proved facts and circumstances give equal support to the inconsistent theories of plaintiff and defendant. Law v. Louisville, etc., R. Co., supra; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819.

But in considering whether the proved facts and circumstances give equal support to the inconsistent theories of plaintiff and defendant, or whether equal probabilities exist in relation to such theories, upon a motion to direct a verdict for defendant, the court must be governed by the general fundamental rule in regard to directing verdicts, to-wit: if the minds of reasonable men must reach a conclusion adverse to plaintiff, from all the facts and circumstances shown, upon an issue which is fatal to plaintiff's cause of action, the court should hold as a matter of law that plaintiff has not made out his case, and direct a verdict for defendant. Hines v. Partridge, 144 Tenn. 219, 231 S. W. 16; Patillo v. Gambill, 22 Tenn. App. 485, 124 S. W. (2d) 272.

There would seem to be no difficulty about applying these rules to the instant case. The specific issue, which is made by defendants' motion for directed verdict, is this: do the proved facts and circumstances equally support the inconsistent theories of plaintiffs and defendants; or do these facts and circumstances show equal probabilities in relation to those theories? We cannot say the minds of reasonable men might not differ on this question under the facts and circumstances shown.

It is true that the theory of defendants is supported by direct and positive evidence—the testimony of defendant, Phillips. But circumstantial evidence may

bé sufficient to overcome the swearing of witnesses. Nashville Railway & Light Company v. Owen, 11 Tenn. App. 19, 24; Adamant Stone & Roofing Company v. Vaughn, 7 Tenn. App. 170, 177; Sprankle v. Mathis, 4 Tenn. Civ. App., Higgins, 522.

The correct rule is stated in 32 C. J. S., Evidence, sec. 1039, where it is said: "Any issue may be proved by circumstantial evidence, or by a combination of direct and circumstantial evidence. A well connected train of circumstances is as cogent of the existence of a fact as any array of direct evidence, and may outweigh opposing direct testimony; and the concurrence of well authenticated circumstances has been said to be stronger evidence than positive testimony unconfirmed by circumstances."

We are clearly of the opinion that all the evidence in this case presented a question of fact for the jury.

4. Defendants insist that the trial judge committed error by failing to deliver a written charge to the jury when he had been requested by defendants so to do. The specific objections to the charge are: (1) It was not signed by the trial judge; (2) it was not physically delivered to the jury to be taken into the jury room with them; and (3) the unsigned written charge which was read to the jury contained words which were not read to the jury.

The original charge is in the record. It shows that the judge used a printed form which is commonly used ·by trial judges and made this form apply to the case on trial by striking out the parts which were not applicable, and writing in the portions which were necessary to properly instruct the jury. This charge was not signed and it was not physically taken into the jury room by the jury.

No question is made about the contents or sufficiency of the charge. Defendants rely strictly upon the

technical objections noted above. These objections are based upon section 8809 of the Code of Tennessee, which provides: "In civil causes charge of court to be in writing, when.—On the trial of all civil cases, it shall be the duty of the judge before whom the same is tried, at the request of either party, plaintiff or defendant, to reduce every word of his charge to the jury to writing, before it is delivered to the jury, and all subsequent instructions which may be asked for by the jury, or which may be given by the judge, shall, in like manner, be reduced to writing before being delivered to the jury."

Section 11749 of the Code of Tennessee is a similar statutory provision which applies to criminal cases. We quote it: "Judge's charge in felonies.—On the trial of all felonies, every word of the judge's charge shall be reduced to writing before given to the jury, and no part of it whatever shall be delivered orally in any such case, but shall be delivered wholly in writing. Every word of the charge shall be written, and read from the writing, which shall be filed with the papers, and the jury shall take it out with them upon their retirement."

It has been held by our Supreme Court that the requirements of these statutes are imperative, and a failure to strictly comply with them constitutes reversible error. Newman v. State, 65 Tenn. 164; State v. Bungardner, 66 Tenn. 163; Insurance Company v. Trustees C. P. Church, 91 Tenn. 135, 18 S. W. 121; Columbia Veneer, etc., Company v. Cottonwood Lumber Company, 99 Tenn. 122, 41 S. W. 351; Humphreys v. State, 166 Tenn. 523, 64 S. W. (2d) 5.

There is nothing in Code Section 8809 which requires the trial judge to sign the written charge which he reads to the jury, nor to physically deliver such writ-

ten charge to the jury to be taken into the jury room with them. The strict requirements of this statute have been fully met when the trial judge reduces "every word of his charge to the jury to writing;" reads that written charge to them; and does not deliver one word of his charge to them orally.

■■■ The statutes relating to civil and criminal cases are separate and distinct acts; and the positive requirement of the statute relating to criminal cases that "the jury shall take it (the charge) out with them upon their retirement" cannot be read into the statute relating to civil cases by judicial interpretation when that provision does not appear in the statute relating to civil cases.

■■■ The following words in the printed form, which was used by the trial court, were not stricken out by the court in preparing his written charge upon the printed form: "The declaration in the third count alleges" and "The declaration in the fourth count alleges." The declaration in the suit on trial contained only one count, but the foregoing words in the printed form which the court failed to strike out were superfluous if left in the charge, and would have been harmless if they had been read to the jury. We think the written charge which appears in the record sufficiently complies with this statute.

■■■ There is another reason why this court would not reverse for the alleged error relating to the charge of the court. Code Section 10654 provides: "No reversal or new trial for errors not affecting the results of the trial.— No verdict or judgment shall be set aside or new trial granted by any appellate court, in any civil or criminal cause, on the ground of error in the charge of the judge to the jury, or on account of the improper admission or rejection of evidence, or for error in acting on any plead-

ing, demurrer, or indictment, or for any error in any procedure in the cause, unless, in the opinion of the appellate court to which application is made, after an examination of the entire record in the cause, it shall affirmatively appear that the error complained of has affected the results of the trial."

In the bill of exceptions, immediately after the charge of the court, the following appears:

"After the court had concluded reading his charge to the jury the court asked counsel for the parties if there were any special requests. Counsel for plaintiff said there were none. Counsel for defendants stated there were none and that defendants were satisfied.

"All counsel for the parties were present when the court's charge was read to the jury and when the jury retired. Defendants' counsel did not make inquiry if the court had handed the jury the written charge of the court and did not at any time make request of the court that the written charge be handed or sent to the jury otherwise than heretofore stated. The jury did not at any time request to see the written charge or request further instructions of the court."

Code Section 10654 was construed in Thomason v. Trentham, 178 Tenn. 37, 154 S. W. (2d) 792, 793, 138 A. L. R. 461, where the court said: "Under the Act of 1911, probabilities and tendencies of errors in the trial below are not to be considered grounds for reversal. There must be an affirmative appearance that the error affected the result of the trial and we think this does not here appear."

█ There is no affirmative showing that the alleged error, about which defendants complain, affected the result of the trial. To the contrary, we think it affirmatively appears that it did not.

5. There remains only one question: that the verdict was so excessive as to show passion, prejudice and caprice on the part of the jury.

The amount of damages is primarily a question for the jury; and their verdict is entitled to great weight in this court when the trial court has approved it, if there is no claim that the verdict is corrupt or dishonest. Lunn v. Ealy, 176 Tenn. 374, 141 S. W. (2d) 893; Sweeney v. Carter, 24 Tenn. App. 6, 137 S. W. (2d) 892; Municipal Paving & Construction Company v. Hunt, 22 Tenn. App. 380, 123 S. W. (2d) 843; Rice-Stix Dry Goods Company v. Self, 20 Tenn. App. 498, 101 S. W. (2d) 132.

Where the pleadings and proof justify the assessment of punitive damages, the allowance of such damages is a matter of discretion with the jury. Simpson v. Markwood, 65 Tenn. 340; Ferguson v. Moore, 98 Tenn. 342, 39 S. W. 341; Louisville, etc., R. Company v. Satterwhite, 112 Tenn. 185, 79 S. W. 106; Davis v. Farris, 1 Tenn. App. 144; Grizzard & Cuzzort v. O'Neill, 15 Tenn. App. 395.

Having reached the conclusion that an autopsy had been performed on the body of plaintiffs' child, the jury was justified in awarding the damages which it did. There can be no doubt that plaintiffs suffered intense mental anguish because of the operations which were performed upon the body of their baby. The circumstances of its death were more shocking than a death caused by disease. It was a grievous wrong to add to that mental suffering and anguish the additional burden of knowing that the body of their baby had been completely cut open and the vital organs cut loose from the body and removed therefrom and then put back into the body and the body sewed up in that condition and pre-

pared for burial. If defendants committed this wrongful act, and the jury found they did, it was a wilful and deliberate violation of the rights of plaintiffs. We do not think this court should disturb the verdict of the jury and the judgment of the trial court. All assignments of error are overruled and the judgment of the trial court is affirmed with costs.

Felts and Howell, JJ., concur.