**STATE of Tennessee, Appellee,**

v.

**Nathaniel BLAIR, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Jan. 29, 1982.

Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville, Kenneth Miller, Asst. Dist. Atty. Gen., Cleveland, for appellee.

R. Jerome Shepherd, Cleveland, for appellant.

## OPINION

DAUGHTREY, Judge.

The charges in this case arose from an act of forced sodomy allegedly committed by defendant Nathaniel Blair against his fellow jail inmate, David Duggan. The defendant did not testify, but the theory of the defense was that no attack occurred on the night in question. To support this theory, the defendant produced the testimony of several other prisoners incarcerated in the same cell block as Blair and Duggan. The jury nevertheless found Blair guilty of committing a crime against nature * and of being a habitual criminal. We have determined that Blair's conviction and his resulting life sentence must be set aside because of a jury instruction on positive and negative testimony that may have improperly discredited many of the witnesses offered in the defendant's behalf.

---

* Blair was also found guilty of aggravated rape, but the trial court ruled that both convictions could not stand, and by agreement judgment was entered on the less serious of the two offenses.

The 19 year old victim, Duggan, was the State's main witness. He testified that during the early morning hours of the day after Thanksgiving 1980, he was sleeping in a Bradley County jail cell block that contained a dayroom, a hallway (or "catwalk"), and three eight-bunk cells. The guards did not lock the cells at night, and thus occupants of the cell block had access to the entire area at all times.

On the night in question, Duggan and defendant Blair were sleeping in different cells in the cell block. Duggan testified that at about 4:00 or 4:30 A.M., he was awakened by the pressure of the tip of a ball point pen being held to his throat. Turning his head, Duggan said he saw Blair facing him. He testified that Blair told him he intended to rape him and warned Duggan not to make any noise. According to Duggan, Blair then swung from the commode on which he had been standing onto Duggan's upper bunk, straddled him, and forcefully penetrated Duggan's anus with his penis. Duggan estimated that the act continued from five to eight minutes. He also testified that he cried out once, awakening his cellmate, Artis Knox. Duggan said that Knox sat upright in his bunk, which was below Duggan's and right in front of it.

A total of four men who shared the cell block with Duggan and Blair testified that they heard nothing unusual the night of the incident. Artis Knox, who was sleeping two feet away from Duggan, testified that he did not hear anything out of the ordinary, and that, contrary to Duggan's testimony, he did not wake up or sit up in his bunk during the night. Knox said in effect that given his proximity to Duggan, if the incident described by Duggan occurred, it could not have escaped his notice.

Another inmate, Wayne Johnson, was sleeping on the top bunk of the cell adjoining Duggan's. Johnson said that he was under strong medication and slept through

that night without hearing anything. Victor Carver was also housed in the adjoining cell. He testified that he "kept the radio going all night" and did not hear a rape occur. A third occupant of the cell, Roy Otto Lunsford, testified that he stayed awake that night, sitting on his bunk smoking cigarettes. Lunsford said that from his bunk he could have heard Duggan cry out but heard nothing unusual from the adjoining cell.

No witness for the State other than Duggan testified affirmatively that the attack occurred.

The next morning, Duggan told a trusty he needed to talk to a jailer. Later that day, apparently under the ruse of making a phone call, Duggan was taken out of his cell block and was eventually able to report the alleged events of the previous night to an investigating officer. He was taken to a hospital for examination, but no medical evidence was introduced at trial.

Duggan testified that Blair had repeatedly offered him money to drop the charges. One of these conversations was corroborated by the testimony of a fellow inmate. However, there was also testimony from two other inmates and a trusty to the effect that Duggan actually initiated the conversation with Blair offering to drop the charges if Blair would give him money or, in one case, an ounce of "dope." Called to testify in rebuttal, Duggan denied that he had ever offered to drop charges against Blair.

■ Given the evidence in the record, we are unable to say as a matter of law that the proof is not sufficient to support the verdict. The defendant complains that no medical evidence was introduced at trial, but this is a deficiency which affects the weight of the evidence and addresses itself solely to the jury. It is not the function of the reviewing court to reweigh the evidence. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). The lack of an eyewitness or other corroborating evidence is also irrelevant on appeal, since the law does not require corroboration of an alleged sexual offense unless the purported victim is

shown to be an accomplice. *Bethany v. State*, 565 S.W.2d 900, 903 (Tenn.Crim.App. 1978). Here there was no such showing.

Despite the sufficiency of the State's proof, however, it appears that the jury may have improperly discounted the testimony of certain crucial witnesses presented by the defendant to meet that proof, because of an instruction given by the trial judge with reference to positive and negative testimony, as follows:

> In the law, positive testimony is that where a witness swears that he was present at a certain time and place and that a certain thing was said, or was not said, or occurred or did not occur. This is positive testimony. On the other hand, negative testimony is that in which a witness swears that he was also present at the same time and place, and that if a certain thing was said, or if a certain thing occurred, that witness did not hear or see it. I instruct you that the positive testimony of one credible witness will outweigh the negative testimony of any number of witnesses.

The defendant argues that this instruction should not be given in any event, but particularly not under the facts in the instant case. The State counters by insisting that the charge merely articulates the long-recognized rule distinguishing positive testimony from negative testimony.

In its simplest form this rule provides that "if a witness swear positively that he saw or heard a fact, and another who was present, that he did not see or hear it, and the witnesses are equally faithworthy, the affirmative witness is to be believed." *Delk v. State*, 40 Tenn. 79, 81 (1859). *See also Stitt v. Huidekoper*, 17 Wall. (U.S.) 384, 21 L.Ed. 644 (1873); *Aetna Life Insurance Co. v. Ward*, 140 U.S. 76, 11 S.Ct. 720, 35 L.Ed. 371 (1891); *see generally* Annot., 98 A.L.R. 161; 30 AmJur.2d §§ 1092–1093; 2 Wigmore, Evidence § 664 (Chadbourn rev. 1979).

Courts have applied the negative evidence rule in various contexts: in determining the materiality of evidence, as in *Whit-*

*field v. Loveless,* 1 Tenn.App. 377, 396 (1925); in deciding whether to grant a directed verdict, as in *Phillips v. Newport,* 28 Tenn.App. 187, 187 S.W.2d 965, 970–71 (1945); *Dalton's Estate v. Grand Trunk R.R.,* 350 Mich. 479, 87 N.W.2d 145, 150 (1957); in fact-finding when the judge sits without a jury, *Fults v. Pearsall,* 408 F.Supp. 1164, 1167 (E.D.Tenn.1975); in reviewing the sufficiency of the evidence, as in *Wallin v. Greyhound Corp.,* 341 F.2d 521, 523 (6th Cir. 1965); *Davis v. Wilson,* 522 S.W.2d 872, 878 (Tenn.App.1974); and in charging the jury, as in *Delk v. State, supra; Williams v. Kirkman,* 71 Tenn. 510 (1879); *Cincinnati N.O. & T.P. Ry. v. Abbott,* 5 Tenn. C.C.A. (Higgins) 22, 34 (1914); *Aetna Life Insurance Co. v. Ward, supra.*

The cases express two different policy reasons for the negative evidence rule. Some courts justify application of the rule on the ground that a witness who testifies negatively may have simply forgotten what actually occurred. The rationale here seems to be that while "[i]t is possible to forget a thing that did happen ..., [i]t is not possible to remember a thing that never existed." *Stitt v. Huidekoper, supra,* 17 Wall. (U.S.) at 394; *see also Cincinnati N.O. & T.P. Ry. v. Abbott, supra,* 5 Tenn. C.C.A. (Higgins) at 32. Other courts justify the rule on the ground that the negative witness cannot be found guilty of perjury. *See, e.g., Delk v. State, supra.* The analysis in this instance is that positive testimony and negative testimony concerning the same event do not necessarily conflict; both may be true. *See, e.g., Atkins v. Smith,* 9 Tenn.App. 212, 216–217 (1928); *Aetna Life Insurance Co. v. Ward, supra,* 140 U.S. at 87, 11 S.Ct. at 724.

■ One important limitation on the rule has gradually evolved. When a witness with an opportunity to observe or hear testifies that he saw or heard nothing, that testimony is said to be *positive* in nature, and the rule with respect to negative testimony does not apply. That is, if the witness must have heard or seen the event if it happened at all, the testimony ceases to be negative and becomes positive, even though it is couched in negative terms. *Williams v. Kirkman, supra,* 71 Tenn. at 511; *Atkins v. Smith, supra,* 9 Tenn.App. at 217; *Phillips v. Newport, supra,* 187 S.W.2d at 970; *Cotton v. Willmar and S.F. Ry. Co.,* 99 Minn. 366, 109 N.W. 835, 836–837 (1906); *Richter v. Dahlman & Inbush Co.,* 179 Wis. 7, 190 N.W. 841, 842 (1922); *Anderson v. Horlick's Malted Milk Co.,* 137 Wis. 569, 119 N.W. 342, 345–346 (1909).

Thus, in an 1859 Tennessee obscenity case, *Delk v. State, supra,* the court held an instruction on negative testimony improper and reversed the defendant's conviction. The proof showed that defendant Delk and one Adkins had been lying in the same bed in a room occupied by several other people. All were talking and at least some were drunk. Witness Emory testified that he heard the accused use obscene language. On the other hand, witness Phillips, testifying that he was sober and was particularly attentive, said that he heard the obscene statements in question and that Adkins spoke them, not the defendant. Under these circumstances, the court found it improper to instruct the jury that Phillips's testimony was negative and due less credence.

In a tort case, *Cincinnati, N.O. & T.P. Ry. Co. v. Abbott, supra,* the Tennessee Court of Appeals similarly held a negative testimony instruction to be reversible error. The plaintiff in that case sought to recover for injuries she received when the defendant's train hit her. She testified that she did not hear the train whistle. ("It wasn't blowed at all. If it did, I didn't hear it.") *Id.,* 5 Tenn. C.C.A. (Higgins) at 27. A bystander also testified that the train whistle did not blow. On appeal, the court held that the negative evidence rule did not apply to this situation, saying that in order to find negative testimony to be without weight, the negative nature of the testimony must be attributable to inattention, defective memory, or insufficient means of knowledge. *Id.* at 32. *See also State of Tennessee v. William Burk Smith,* Court of Criminal Appeals at Nashville, filed November 10, 1981, in which the court noted that

"[i]f a witness, having been present, testifies that he was attentive but did not see or hear or otherwise observe the alleged fact or event, his testimony, while commonly termed as negative, is not of a purely negative character." *Cf. Delk v. State, supra,* 40 Tenn. at 81. Because plaintiff Abbott and the bystander would have heard the whistle had it sounded, the trial court was held to have erred in instructing the jury that their testimony was entitled to no weight against that of the train's engineer and fireman. The *Abbott* court concluded that the "credit and weight [to be given such negative testimony] were matters for the jury to determine in the light of all the evidence before them." 5 Tenn. C.C.A. (Higgins) at 34.

■ In the instant case, four persons occupying the cell block on the night of the incident in question testified that they heard nothing. Under the standards analyzed above, the testimony of Johnson and that of Carver might legitimately be held to constitute negative testimony. They both slept through the night in an adjoining cell and Johnson was under the influence of medication. Their opportunity to observe or hear was thus impaired.

■ On the other hand, the testimony of Knox and Lunsford amounts to positive evidence, albeit it in negative form. Knox directly contradicted the victim's testimony that Knox had heard Duggan's cry of distress and had sat up in bed in response to it. Knox further testified that the incident, if it happened as Duggan described, could not have escaped his notice. Lunsford testified that he was awake that night and could have heard the incident if it had happened, but heard nothing. Because Knox and Lunsford each had an opportunity to hear or observe, their testimony that they heard nothing constitutes positive evidence. For, one court has noted, "[s]ilence is as much a fact as sound and the proof of one disproves the other." *Cotton v. Willmar & S.F. Ry. Co., supra,* 109 N.W. at 837.

■ Thus, accepting the validity of the positive-negative evidence distinction, under the circumstances of the instant case

the trial court erred in charging the jury that "negative testimony is that in which a witness swears that he was also present at the same time and place, and that if a certain thing was said, or if a certain thing occurred, that witness did not hear or see it." Moreover, the instruction was also legally inaccurate to the extent that it allowed the jury to give no weight at all to "negative testimony" as defined by the trial judge ("I instruct you that the positive testimony of one credible witness will outweigh the negative testimony of any number of witnesses."). To the contrary, Tennessee law recognizes that:

> While there have been statements to the effect that negative evidence is entitled to no weight, the more common view is that it is not necessarily destitute of probative value, but is entitled to consideration, and, where the facts justify it, is substantive evidence of a fact, and may be sufficient to raise or establish an issue or support a finding. Its probative force depends largely on circumstances, and more particularly on the likelihood that the witness would have observed the fact had it occurred.

*Phillips v. Newport, supra,* 187 S.W.2d at 970.

The foregoing analysis gives some credence to the defendant's argument that the rule with respect to positive and negative evidence is not a proper subject for jury instruction. If the subtleties of the distinction cause disagreement among trained experts as to what is or is not negative evidence, it is easy to see that a jury might become confused in trying to apply the rule. And in Tennessee, at least, any explicit effort by the trial judge to avoid that confusion (for example, in this case by distinguishing in the charge between the testimony of Carver and Johnson and that of Knox and Lunsford) could conceivably run afoul of the state constitutional provision against comment on the evidence. *See* Tennessee Constitution Art. 6, § 9.

In modern times the negative evidence rule has drawn considerable criticism. Wigmore's treatise on evidence cogently at-

tacks the basis for rule, pointing out that positive and negative knowledge rest on the "same data of the senses" and that the "only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact [that the event in question] occurred." 2 Wigmore, Evidence § 664 (Chadbourn rev. 1979). The textwriter concludes that the conditions affecting correctness and fullness of observation are numerous and varied, and that the complexities of human perception cannot be handled by a rule of thumb about negative testimony:

> [T]he rule is a discredit to the science of law and should be discarded. The vain lucubrations to which it leads have no relation to the real probative value of specific testimony.

*Id.* at note 2.

Moreover, as one court has noted, a negative evidence instruction may serve only to confuse the jury:

> Discussions of that sort, often scholastic, or at least highly metaphysical, could give the jury little aid in arriving at the truth of the matter and are likely to lead to confusion. Scientifically trained jurors, whether desirable or not, cannot be produced at one sitting while in medias res. And, perhaps, the school in which jurors learn to think straight is to be preferred, although it never closes a session, dismisses a pupil, or gives a diploma. It would be found that most of the things the Court needs to impress are well within the everyday experience and understanding of the jurors in simpler form, and in dealing with the elements of credibility actually involved the Court will usually find familiar instruments of guidance for the jury, without the necessity of making an excursion into the field of epistemology and psychology.

*Carruthers v. Atlantic & Yadkin Ry. Co.,* 218 N.C. 49, 9 S.E.2d 498, 500 (1940), *on rehearing* 218 N.C. 377, 11 S.E.2d 157 (reversed on other grounds).

As another court has recognized, formulation of a rule regarding negative testimony may involve semantics rather than substance:

> Testimony that a certain event did not occur may range all the way from that of the nuclear physicist who testifies that in a certain experiment fusion did not take place, to that of the village drunk who, at the moment of occurrence, was in his cups and not observing much of anything. The ancient rule that positive testimony is to be accorded more weight than negative ... is avoided in the hard cases, when necessary to change the result without changing the rule, in the law's time-honored way, simply by calling it something else not forbidden by the rule. Thus the testimony of the physicist becomes (by reason of his attention and acuity) "positive."
>
> Such fencing with words casts no light on the problem [that arises from testimony that relates to non-occurrence, which is that] from it two conflicting inferences are possible, a) that the event did not occur, or b) that it did occur but that the witness, for certain reasons, did not hear it.

*Dalton's Estate v. Grand Truck Western R.R. Co.,* supra, 87 N.W.2d at 149 (citations omitted).

Thus, the court in *Dalton's Estate* concluded:

> The mere fact of non-hearing, standing alone, ordinarily has no probative value whatever as to the occurrence, or non-occurrence, of the event. Many of us did not hear the bombs falling at Pearl Harbor. Thus the burden upon him who relies upon negative testimony is marked: he must show the circumstances pertaining to the non-observance, the witness' activities at the time, the focus of his attention, is [sic] acuity or sensitivity to the occurrence involved, his geographical location, the condition of his faculties, in short, all those physical and mental attributes bearing upon his alertness or attentiveness at the time.

*Id.*

Even when testimony qualifies as purely negative, a legally proper negative

evidence instruction may serve only to confuse the jury. Furthermore, when a witness with an opportunity to observe or hear testifies negatively, courts classify the testimony as positive, and a negative evidence instruction is improper. Because the negative evidence rule promotes more confusion than clarity, we think the better practice would be to omit the instruction altogether.

If an instruction *is* given, however, it must allow the jury to weigh the evidence in light of criteria such as those suggested in *Dalton's Estate, supra.* The jury must be permitted to determine whether the testimony falls on the nuclear-physicist end of the spectrum, so to speak, or on the Pearl Harbor end. It is possible that in the instant case the jury might have chosen to discredit the testimony of some of the inmates called by the defendant to testify as to the non-occurrence of the event in question. But in failing to properly distinguish between positive and negative testimony and in charging the jury, in effect, that testimony related to non-observation carried no weight at all, the trial judge deprived the jury of the opportunity to weigh this testimony and thus prejudiced the defendant's case unfairly. As did the courts in *Delk v. State, supra,* and in *Williams v. Kirkman, supra,* we hold that this error was reversible.

Because the case must be retried, we need comment only briefly on the remaining allegations of error. The defendant contends, for example, that remarks made by the prosecution during closing argument amount to an improper comment on his failure to testify. In his closing remarks, the attorney for the State said:

Nobody who has testified for the defense said that this didn't happen. All they said is if it did happen I didn't happen to hear it, I was asleep and it didn't wake me up, or I was in another cell and I didn't hear an outcry.

After careful consideration, we have concluded that there was no Fifth Amendment violation committed by virtue of this argument. However, we take this occasion, as have countless appellate courts before us, to caution against prosecutorial brinksmanship in closing argument of this nature. It is, of course, permissible to summarize the witnesses' trial testimony and under our law the State is permitted to assert that its case is unrefuted. However, it is perilous to argue that no one has denied that an event occurred when the defendant is the only person realistically in a position to deny it and has not taken the stand. Here it would be permissible to argue that the offense could have occurred even though none of the witnesses observed it; to go further is to invite unnecessary error.

The defendant also complains that when he tried to impeach the victim's testimony by reputation evidence, he was improperly thwarted by the trial judge's threat that his own reputation would thus be subject to impeachment, even though he did not intend to take the stand. The colloquy in the record on this point is as follows:

Q [by defense counsel]: Wayne, do you know what Mr. Duggan's reputation is up here in the jail for truth and honesty?

THE COURT: Let me tell you, Mr. Shepherd, you are asking these fellows in jail that question and it opens the door, the state can ask about reputation about the other fellow [defendant Blair], and you are just opening the door and then in a minute the Attorney General's going to come through it and then there's not anything you can do about it.

COUNSEL FOR DEFENDANT: We will withdraw the question then as to reputation.

The record suggests that defense counsel interpreted the trial court's comment to mean that upon cross-examination of this witness the State would be allowed to impeach the defendant's character even though he had not taken the stand. If this was indeed the import of the trial judge's statement, he was clearly in error. The State argues on appeal, however, that the trial court may have intended only to remind defense counsel that the same witnesses used to impeach Duggan might later be used against his client, in the event Blair

testified. Since the record is not clear on this point, due principally to the defendant's failure to seek clarification of the reason for the ruling, we cannot say that the trial court committed error in this regard.

■■■ We have reviewed the remaining issues and find them to be without merit. The record fails to show abuse of the trial court's discretion in controlling voir dire of the jury or examination of the witnesses. Moreover, the State's impeachment of a defense witness concerning his alcoholism and penchant for sniffing glue was arguably relevant to a determination of the witness's ability to observe and recall the events about which he testified. Furthermore, the trial court properly precluded defense counsel's attempt to impeach the victim by demonstrating his alleged homosexual proclivities, because consent was not an issue in this case and because such evidence was not otherwise admissible under *State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976).

For the reasons set out above, the judgment of the trial court is reversed, and the case is remanded for a new trial.

CORNELIUS, J., concurs.

BYERS, Judge, concurring.

While I concur in the results reached by my colleagues, I do not agree with all of their reasoning on the issue of positive and negative evidence.

In defining negative testimony the trial court instructed the jury "negative testimony is that in which a witness swears that he was also present at the time and place, and that if a certain thing was said, or if a certain thing occurred, that witness did not hear or see it." This instruction defines negative evidence too broadly and encompasses positive and negative testimony.

Although the instruction given in the instance case defines negative testimony too broadly, I do not agree it would be better for the trial court to omit an instruction on positive and negative testimony altogether. In cases where there is negative testimony, the jury should be instructed on how to weigh such testimony in relation to positive testimony.

At most, it seems to me, negative testimony should rise no higher than circumstantial evidence. An instruction is required on circumstantial evidence, and I see no reason for not requiring an instruction on negative evidence.